STATE OF VERMONT

ENVIRONMENTAL COURT

|  | } |  |
|---|---|---|
| In re: Application of Severance | } | Docket No. 10-1-08 Vtec |
|  | } |  |
|  | } |  |

Decision and Order

Appellant Timothy Severance appealed from a decision of the Planning Commission of the Town of Hartford, denying his application for a four-lot subdivision. Appellant is represented by Thomas Hayes, Esq.; the Town of Hartford is represented by William F. Ellis, Esq.

The sole issue on appeal is whether the application meets the requirements for subdivision approval with regard to the standards for access to a state highway.

An evidentiary hearing was held in this matter before Merideth Wright, Environmental Judge. A site visit was taken with the parties' representatives. The parties were given the opportunity to submit written memoranda and requests for findings, and extended the time for these filings briefly, by agreement. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

Appellant owns a 13.56-acre parcel of property on the west side of U.S. Route 4 in Hartford. It is located in an RL-1 zoning district, in which single-family lots must be at least one acre in area. Appellant purchased the property in late June of 2005, two months after its former owner had obtained a permit from the Vermont Agency of Transportation (VTrans) to remove a section of guard rail and establish a driveway access onto Route 4 for a single-family residential use.

1

On August 15, 2005, Appellant initially applied to VTrans to use the access for a four-lot subdivision. The application form asked three questions as to whether permits were required for the project. Appellant checked the box for "no" on the questions of whether a "Zoning Permit" and an Act 250 permit were required for the project. On the third question of whether "[o]ther permit(s) required?" Appellant checked the box for "yes" but only listed "driveway" permit as the other required permit. While neither party has provided the zoning regulations, from the text of Condition 1 of the Planning Commission's written decision, see Town's Ex. D, it appears that a zoning permit as well as subdivision approval is in fact required for a subdivision, but that an application for a zoning permit would not necessarily be submitted until after subdivision approval would have been obtained.

After an initial denial in January of 2006, VTrans granted the access permit for a four-lot subdivision on October 11, 2006. The statute under which VTrans grants access permits prohibits it from denying a permit for "reasonable" entrance to or exit from property abutting state highways, using "safety, maintenance of reasonable levels of service on existing highways, and protection of the public investment in the existing highway infrastructure as the test for reasonableness." 19 V.S.A. § 1111(b). However, it allows such denial "as necessary to be consistent with the planning goals of 24 V.S.A. § 4302 and to be compatible with any regional plan, state agency plan or approved municipal plan." Id. VTrans also "may, as development occurs on land abutting the highway, provide as a condition of any permit for the elimination of access previously permitted . . . ." 19 V.S.A. § 1111(f). The VTrans Access Management Program Guidelines allow VTrans to allow private direct access to "continue until such time that some other reasonable access to a lower function category street or highway is available." Town's Ex. H at 14–15. In such a case, "[t]he access permit should specify under what circumstances the change would be required, . . ." Id. at 15.

2

On October 19, 2006, a VTrans District Technician issued an inspection report stating that final inspection of the driveway was completed and that "[t]he driveway appears to have been constructed in accordance with the conditions of the permit." Appellant's Ex. 9.

The project property as a whole is roughly a quarter circle in shape, bounded on the northwest by land of the Quechee Lakes Landowners' Association (marked on the survey as "Polo Field"), on the southwest by land of the United States of America, and on the curve by Route 4. Proposed Lot 1 is 4.02 acres in area, proposed Lot 2 is 4.32 acres in area, proposed lot 3 is 2.77 acres in area, and proposed Lot 4 is 2.45 acres in area. Three of the proposed lots (Lots 1, 3, and 4) are bounded by the Route 4 right-of-way; the fourth lot (Lot 2) lies to the west of the other three.

The topography is such that the project property is located down a steep embankment, approximately 14 feet below the elevation of Route 4, and slopes more gently down from there, towards the north and west. The configuration of lots and building envelopes for the project has been designed to avoid wet areas identified on the project plans. Appellant obtained approval from the state Agency of Natural Resources for the water supply and wastewater disposal systems for the proposed lots. Appellant's Ex. 10.

Access to Route 4 for all of the lots is proposed to be via a single curb cut, with a 'landing' area at the elevation of Route 4 where vehicles can wait, oriented at a 90° angle to Route 4, to enter onto Route 4. The curb cut and landing area have been constructed. After obtaining VTrans approval of the use of the curb cut for access to four lots rather than to a single lot, Appellant applied under the subdivision regulations to the Planning Commission of the Town of Hartford for a subdivision permit.

3

The Planning Commission denied subdivision approval; that denial has been appealed in the present case.[1]  All other criteria for approval of a minor four-lot subdivision are met by the proposal and are not at issue in this appeal, other than criteria to do with the configuration of the project driveway on the property, and access onto Route 4 from the property.

Conflict Between the Planning Commission's Written Decision and Meeting Minutes

Before addressing the merits of the application, it is necessary to note an anomalous practice of the Planning Commission that could have resulted in remand of this matter, except that the parties both agreed that the Court should instead proceed to address the merits of the application.  The "Conclusions of Law" section at page 6 of the written decision of the Planning Commission "concludes that the proposed subdivision meets the requirements of the Town of Hartford Regulations for a Minor Subdivision." Town's Ex. D.  The "Decision" section at pages 6–7 of the written decision states that the Planning Commission denies the application, but in the same sentence goes on to impose four conditions (including the redesign of the access road to include a guard rail) before a zoning permit is issued and before certificates of compliance are issued for the dwellings on the four lots.  The final sentence of the written decision document, just above the signature of the Commission chairperson, states in bold print:  "[t]he Commissioners' reasons for opposing the motion to approve the application are outlined in the minutes of the meeting."  The minutes of the Planning Commission's

---

[1] VTrans issued a Notice of Permit Violation on December 21, 2007, primarily based on the Planning Commission's denial of the subdivision permit at issue in the present appeal and secondarily because the driveway for Lot 4 was shown as located within the state highway right-of-way.  Appellant has presented an alternative access road design for the property that has cured any issue of intrusion into the state highway right-of-way.  VTrans has not revoked its issuance of the access permit for the four-lot subdivision.

December 17, 2007 meeting are attached after a list of the exhibits that were submitted to the Planning Commission. See Town's Ex. D.

Apparently, it is the practice of the Hartford Planning Commission to leave positive findings, conclusions, and permit conditions from a draft decision in the text of the final written decision, even when the Planning Commission has actually voted to the contrary, and instead to rely on the minutes of the meeting to state the "reasons" for the contrary denial. Leaving aside the adequacy of any findings, conclusions or reasons reflected in the comments of the Commissioners as stated in the minutes, this practice creates an unacceptable level of confusion for parties and for any reviewing court as to what decision the Planning Commission has made, as well as to the Commission's rationale or reasoning supporting that decision.

The final sentence of 24 V.S.A. § 4464(b)(1) allows the minutes of the meeting to suffice as the written decision required by that section, provided that the required "factual bases and conclusions relating to the review standards" are reflected in the written minutes. However, nothing in § 4464(b)(1) suggests that a municipal panel may proceed to issue a written decision that by its terms conflicts with the decision voted on by the panel members and expressed in the written minutes.

Subdivision Application

Route 4 is the major local and regional east-west travel corridor in the area. It is used by long-distance truck traffic as well as by local traffic and is classified for transportation planning purposes as a "principal arterial" roadway. It carries approximately 4,415 vehicles eastbound and 4,510 vehicles westbound per day, of which approximately seven to eight hundred are carried in the peak hour.[2] It is

_____

[2] The single-family use would generate approximately ten vehicle trip ends (one-way trips) through the vehicle driveway per day, of which three (two outbound and one inbound) could be expected to be made during the morning peak hour of traffic on

5

considered a Category 3 highway for the purposes of the VTrans Access Management Program Guidelines. The principles of access management and the VTrans Access Management Program Guidelines discourage the intersection of a new driveway directly with a principal arterial roadway. See Town's Ex. H at 14–15.

In the present case at the present time, there is no alternative access to the property other than by Route 4, and Appellant is entitled to use the driveway to access at least one single-family use. The access also meets the state standards for a four-lot use; the only issue regarding the VTrans approval of the four-lot use is whether all required municipal approvals have been obtained. Therefore, in the present case the only question for the Court is whether to approve a subdivision that would create three additional lots, due to issues related to that driveway, including the layout of the access road on the property.

The VTrans access permit granted for Appellant's four-lot subdivision contains the following general condition: "As development occurs on land abutting the highways, the Agency may revoke a permit for access and require the construction of other access improvements such as the combination of access points by adjoining owners." Appellant's Ex. 5 at 2. No evidence was presented in the present case regarding the use of either adjoining property, or whether either adjoining property is served by a local road, or whether potential future access to a local road over either adjoining property is technically feasible.

Although Route 4 is generally referred to as an east-west travel corridor, it runs basically in a north-south orientation in the area from Exit 1 of Interstate 89 to just southwest of the project property. It has one lane in each direction at the project

Route 4, and four (one outbound and three inbound) could be expected to be made during the afternoon peak hour. These generation rates would be multiplied by four for the proposed subdivision. However, unlike the standards for conditional use review, see 24 V.S.A. § 4413(3)(A)(iii), the Subdivision Regulations do not provide for assessing the effect of the proposed subdivision on traffic on adjacent roadways.

property. The project property is located on the westerly side of a shallow inside curve of Route 4. A guard rail is in place along Route 4 adjoining the property, limiting the available space for drivers to take evasive action. At the location of the intersection of Route 4 with the project driveway, the posted speed limit is 40 miles per hour.

The posted speed limit changes from 50 miles per hour to 40 miles per hour approximately 500 feet to the north of the project driveway. However, speed studies show that 92% of the vehicles are traveling at (or below) an actual speed of about 55 miles per hour rather than at the posted speed of 40 miles per hour; accordingly, 55 miles per hour has been used to analyze the available sight distances. The posted speed limit is further reduced from 40 miles per hour beyond the project driveway to the southwest; it is 30 miles per hour as Route 4 enters the Quechee Gorge commercial area farther to the west.

As initially proposed and shown on Appellant's Exhibit 6, the access road for the subdivision ran sharply northwards from the landing area, sloping downwards parallel to Route 4. A portion of the access road and of the driveway to serve Lot 4 were shown on the proposed plan as being located within the Route 4 right-of-way rather than on Appellant's property. At the lower elevation, separate driveways for all four lots then branched off from the common access road.

An alternate proposal, presented at trial and shown on Appellant's Exhibits 7 and 8, avoids placing the access road or a lot driveway in the right-of-way by extending the common access road westerly into the property, before the individual driveways for Lots 1 and 2, and a common driveway for Lots 3 and 4, branch off from it. The alternative proposal meets the Town road standards, which in turn reference the state's so-called "A-76" road design standards, except that the alternative proposal will require a hammerhead turnaround not yet shown on Exhibits 7 or 8, to allow emergency vehicles to safely access and leave the project property.

7

"Stopping sight distance" is the distance needed for a motorist who is driving on the roadway to perceive an obstruction ahead (such as a car turning out of the project driveway) in time to come to a stop prior to reaching the obstruction. The minimum stopping sight distance is a transportation engineering requirement to determine the safety of a proposed intersection location. The required stopping sight distance for vehicles traveling at 55 miles per hour is 495 feet.

The sight distance to or from the north of the project driveway is at least 640 feet (and may be as much as 680 feet as measured by the Town's consultant). The sight distance to or from the south of the project driveway is 610 feet. As at least 640 feet is provided for vehicles approaching the project driveway from the north, and 610 feet is provided for vehicles approaching the area of the project driveway from the southwest, the project driveway is safe, despite the planning preference for avoiding new intersections of private driveways with an arterial roadway.

"Intersection sight distance," also referred to as "corner sight distance," is the distance needed for a motorist who is stopped at an intersection (that is, who is driving a car waiting to turn out of the project driveway) to pull out in front of a vehicle approaching on the roadway and to accelerate to driving speed without affecting the speed of the approaching motorist. The intersection sight distance will be different depending on whether the stopped motorist is making a right turn into the near lane of traffic or is making a left turn across a lane of traffic to the far lane of traffic. Adequate intersection sight distance is necessary to avoid causing delay or reduction in the flow of traffic on the adjacent roadway.

The adequate intersection sight distance for a vehicle stopped at the project driveway to turn right towards the south and west, into the near lane of traffic, is 530 feet. As at least 640 feet is provided from the project driveway to look to the north to see whether it is safe to pull out in front of a vehicle approaching the project driveway from the north, the intersection sight distance at the project driveway is adequate to

8

make safe turns to the right (to the south or westbound) from the project driveway without causing delay on Route 4, as long as the sight lines are kept clear of vegetation and of snow above three feet in height.

The adequate intersection sight distance for a vehicle stopped at the project driveway to turn left towards the north, across the westbound lane and into the far (eastbound) lane of traffic, is 605 feet (according to the Town's consultant) and is 610 feet (according to Appellant's consultant). The intersection sight distance at the project driveway is therefore also met; that is, it is adequate to make safe turns to the left (to the north or westbound) from the project driveway without causing delay on Route 4, as long as the sight lines are kept clear of vegetation and of snow above three feet in height.

The use of the project driveway for four single-family lots, is therefore safe and will not cause delay on Route 4, although it is not preferable from a transportation planning perspective. It would be better to provide access to the new subdivision from a local roadway if such access were to become available. VTrans Access Management Program Guidelines at 14; Town of Hartford Master Plan at 198–99; Town's Ex. F at 5; Town's Ex. J at 2.

Under the Hartford Subdivision Regulations, approval of a subdivision is to be based upon certain "broad considerations" in § 5-1-2 as well as with the specific planning and design standards found in §§ 5-4-1 et seq. Section 5-1-2(1) requires subdivision approval to be based on "[c]onformance with the various parts of the Municipal Development Plan and zoning regulations." Neither party has presented the court with the zoning regulations nor argued that the proposed subdivision fails to comply with any section of the zoning regulations.

The Hartford Master Plan, at 198–99, recognizes that access management onto Route 4 is a "top priority," and lists several "access management strategies" that the

9

Town "can implement through its planning and public[-]works[-]related ordinances and policies."

Of those strategies, the traffic engineering analysis in the present case already uses "sight-distance standards based on the actual travel speeds and not the posted speed limits," and uses "State of Vermont design standards" for the configuration of the access road. Another strategy listed in the Master Plan is the use of "access or an access easement from a local road rather than a State highway," however, in the present case at the present time the property has no such access to a local road. The Master Plan also presents as a strategy: "[w]hen practical, approve subdivisions with private and public road designs that allowed shared access with other adjacent subdivisions and/or have the private rights-of-way reserved so an access may be built to connect to existing and future development."[3] This section is carried out by § 5-4-2.1 of the Subdivision Regulations, discussed below.

Within the Subdivision Regulations, § 5-4-1.1 requires that the land to be subdivided shall be of such a character that it can be used for building purposes without danger to public health, safety, or the environment. The land contained in this property is not subject to flooding or poor drainage, and in fact Appellant has obtained approval for water supply and wastewater disposal for structures on all four lots. There is nothing inherent in the land that would cause a danger to public safety; the proposal meets this requirement of the Subdivision Regulations.

The first sentence of § 5-4-2.1 of the Subdivision Regulations, regarding street layout, requires that "[t]he arrangement of streets in the subdivision shall provide for the continuation of principal streets in any adjoining subdivision[,] or for their proper

---

[3] This decision need not address whether the strategies in the Master Plan are sufficiently specific to make this requirement independently enforceable under the Vermont Supreme Court's decision in In re Appeal of JAM Golf, LLC, 2008 VT 110, ¶¶ 16–17, as this requirement is echoed specifically in § 5-4-2.1 of the Subdivision Regulations.

projection when adjoining property is not subdivided[,] in order to create a logical system." This requirement is particularly important in the present case, to allow use of the private driveway onto Route 4, as that driveway should be required to be discontinued if any alternative access via a local road becomes available. The layout of the four lot subdivision's access road and driveways has failed to provide for the reservation or continuation of a right-of-way towards either the northwest or the southwest boundary, to retain the potential for these subdivision lots to have access in the future via a local roadway. Such layout must be provided, or Appellant must obtain a waiver of that requirement under § 5-6-2 from the Planning Commission in the first instance.

The proposed alternative access road meets the requirements of §§ 5-4-2.5 and 5-4-2.7 requiring construction of new streets or the access road to municipal highway construction standards, except that a hammerhead needs to be provided for emergency vehicle turnaround.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that although the approved access onto Route 4 can be used safely to serve four single-family residential lots, direct access of a private driveway onto Route 4 should be discontinued if alternative access via a local roadway becomes available. The proposed plan for the four-lot subdivision is therefore DENIED, but only because it fails to provide for a lot layout or rights-of-way that would allow future access to the project over its northwest or southwest boundaries rather than directly onto Route 4. Appellant may apply to the Planning Commission for approval of an alternative layout for the subdivision, or a waiver of this requirement, that addresses the reason for which this subdivision was denied. See In re Jolley Assocs., 2006 VT 132, ¶ 12, 181 Vt. 190 (citing In re Carrier, 155 Vt. 152, 157–58 (1990)) (explaining the successive application

11

doctrine); <u>In re Armitage</u>, 2006 VT 113, ¶ 4, 181 Vt. 241 (citing <u>Carrier</u>, 155 Vt. at 158) (same).

Done at Berlin, Vermont, this 24th day of July, 2009.


_____

Merideth Wright
Environmental Judge